A97A2274. WINGFIELD v. THE STATE.
(493 SE2d 235)

JOHNSON, Judge.

A jury found Paul Wingfield, Jr. guilty of rape, two counts of aggravated sodomy, aggravated assault, two counts of burglary and aggravated sexual battery of victim 1 and guilty of rape, aggravated sodomy and burglary of victim 2. Wingfield appeals the convictions entered, and we affirm.

Viewed in the light most favorable to support the verdict, the

record shows as follows:

*Victim 1*

On September 10, 1995, victim 1 fell asleep, around 2:00 a.m., watching television. Although the sliding-glass door to her apartment was closed, the bar used to lock the sliding-glass door was not in place. A noise woke victim 1 and she saw an intruder crawling across the threshold of her bedroom. The television and an aquarium provided light in her bedroom, and victim 1 was able to see that the intruder was under 30 years old, was muscular with a large build, had hair cut very close to his head, had a short beard and moustache, and was wearing light colored shorts and a dark shirt.

Victim 1 started to get out of the bed and saw that the intruder had a large knife in his hand. She pled with the intruder not to hurt her, and the intruder responded, "I'm not going to hurt you, I just want some butt." The intruder grabbed victim 1 by the shoulder, held the knife close to her face, forced her to lay face down on the bed, and pulled off her underwear. The intruder forcibly raped victim 1 as he held the knife to her throat and told her to be quiet or he would cut her throat.

The intruder forced victim 1 to turn over and lay on her back, directing that she not look at him and holding a pillow over her face. He then raped victim 1 again. Subsequently, he forced his penis into her mouth, placed victim 1's legs over his shoulders and forced his penis into her anus. The intruder then turned victim 1 onto her stomach, performed oral sex on her, and forcibly inserted his fingers into her vagina and anus.

After the intruder left the apartment, victim 1 noticed that a six-inch knife had disappeared from her kitchen. Victim 1 testified that the intruder did not have permission to enter her apartment and that she did not consent to the acts of rape, aggravated sodomy, and aggravated sexual battery.

Members of the Athens-Clarke County Police Department found two fingerprints on the sliding-glass door and door frame of victim 1's apartment. These prints were positively identified by a forensic fingerprint examiner with the Georgia Bureau of Investigation State Crime Laboratory as Wingfield's left thumb print.

Helen Frith, sexual assault nurse examiner, examined victim 1 on the date of the rape and sexual assaults. Frith testified that an inspection showed bruising and lacerations of victim 1's external genitalia, bruising of her cervix and bruising on the labia minora and labia majora. She further stated that there was a small laceration on the posterior fourchette, as well as bruising and a laceration next to victim 1's anal area. Frith collected evidence for a sexual assault kit.

Victim 1 was shown books of photographs by law enforcement personnel, but was unable to make a positive identification from these photographs. She was later shown six photographs by an assistant district attorney, but was unable to positively identify Wingfield from the photographs. Victim 1 testified that after she looked at the photographs, she was told that Wingfield's picture was in the set of photographs. Subsequently, victim 1 made a positive in-court identification of Wingfield as the intruder who sexually assaulted her.

*Victim 2*

On October 18, 1995, victim 2 locked all the doors to her apartment and fell asleep reading around 10:00 or 11:00 p.m. Shortly before 3:00 a.m. on October 19, 1995, victim 2 was awakened by someone ringing her doorbell. She turned the light on, but did not answer the door. Subsequently, someone began knocking on the sliding-glass door of her bedroom. The person stated he was "security," "needed help" and requested to use her telephone. Victim 2 told the man to go to the front door.

The hallway light and dining room light were on and the front door was well-lit. Victim 2 described the man as being black and well-dressed, wearing a black and gray striped dress shirt and khaki pants. The man again advised her he was security and needed to use the phone. Victim 2 knew the apartment complex had security guards, but did not know what any of them looked like.

Victim 2 cracked the door to her apartment and handed the phone to the man. He dialed a number, stated that "he was security," that "something was happening," and that "he needed help" and gave the address of victim 2's apartment. He returned the phone to victim 2 and asked if he could wait inside her apartment. Victim 2 told the man he could not. However, as she was leaning over to put down the phone, the man pushed the door open, grabbed victim 2 by the neck and held her against the wall facing away from him. The intruder held a knife or sharp object to her throat.

The intruder told victim 2 to "just do what I say and you won't get hurt." He then pushed her into an unlit bathroom and told her to take her clothes off. After victim 2 removed her bathrobe, the intruder pushed her to the bathroom floor and, holding the knife at her throat, demanded that she perform oral sex upon him. Sometime during this act, the lights came on in the bathroom and victim 2 removed her hands from her face. The intruder screamed "no," put his right hand on her face, squeezed her head and pushed her discarded robe over her face. The intruder then forcibly removed victim 2's underwear and "used his fingers vaginally on [her]."

The intruder picked victim 2 up by the arm, put his arm around

her neck, walked her to the bed, threw her on the bed and raped her. Following the rape, the man picked victim 2 up, pushed her down on the floor and again forced her to perform oral sodomy on him. The man ejaculated on her face.

Victim 2 was then thrown face down on the bed and asked if she had any money. The intruder took a five dollar bill and a pair of binoculars and left.

Members of the Athens-Clarke County Police Department found two window screens missing from victim 2's apartment near a dumpster adjacent to her apartment. The screens were in place on October 18, 1995. Fingerprints were found on the front doorbell and the front window screen. These fingerprints were positively identified as having been produced by Wingfield's right middle, right thumb, left middle and left index fingers by a forensic fingerprint examiner. According to the fingerprint examiner, the fingerprint on the doorbell was of such high quality that a match was obtained with Wingfield's fingerprints on the Automated Fingerprint Identification System computer.

Victim 2 was examined on the date of the incident by Tina Ford, a sexual assault nurse examiner. Ford's physical examination revealed a superficial laceration on victim 2's labia, a circular abrasion on the bottom of her cervix, and red dots under the skin along the bottom of the vaginal opening, which indicate the breaking of blood vessels due to force. Using a lamp, Ford also found an area on victim 2's face where the man had ejaculated. Ford testified that victim 2's injuries were inconsistent with consensual sexual activity. She collected evidence for a sexual assault kit.

Victim 2 testified she did not give the man permission to be in her home on October 19, 1995 and that none of the sexual acts with the intruder were consensual. Victim 2 made a positive in-court identification of Wingfield as the person who raped and sexually assaulted her.

A search of Wingfield's vehicle following his arrest revealed the binoculars stolen from victim 2's apartment. In addition, Wingfield gave a full confession to the burglary, rape and aggravated sodomy of victim 2.

Connie Pickens, employed at the Georgia Bureau of Investigation, Division of Forensic Sciences, tested Wingfield's blood and the sample of the intruder's ejaculation taken from the face of victim 2. Pickens testified that the test indicated a match. According to Pickens, no more than one in ten billion individuals would exhibit the same DNA banding pattern which was shared between Wingfield's blood and the semen. She further testified that the DNA in the samples could not belong to anyone except Wingfield.

1. In his first enumeration of error, Wingfield asserts the trial

court erred in refusing to sever the September 10, 1995 rape and assault of victim 1 and the October 19, 1995 rape and assault of victim 2. We disagree.

"Joinder is justified when the offenses are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan. [Cit.]" *Bickley v. State*, 227 Ga. App. 413, 415 (3) (489 SE2d 167) (1997). These incidents involved (1) occurrences within a short time period in the same county, (2) attempts by the intruder to conceal his identity, (3) women residing alone in large apartment complexes, (4) assaults occurring in the early morning hours, (5) occurrences where neither victim knew the intruder, (6) assurances by the intruder that he would not harm the victim, (7) varied and repeated sexual assaults, including rape and oral sodomy, (8) fingers being inserted into the woman's vagina, (9) the threat or use of a sharp object held to the throat of the victim, and (10) property theft. Based on these facts, the incidents "reached the level of a pattern and . . . therefore constituted parts of a single scheme or plan." Id. at 416. The offenses were " 'so similar as to evidence a common plan or scheme and revealed an identical modus operandi.' [Cit.] Each would accordingly have been admissible to prove the other, and the trial court did not err in refusing to grant a severance. [Cit.]" *Jones v. State*, 168 Ga. App. 652 (1) (310 SE2d 17) (1983).

2. In his second enumeration of error, Wingfield contends the trial court erred in refusing to give two requested jury charges concerning his confession, which was admitted at trial. Specifically, these requested instructions directed the jury not to consider his confession related to the October 19, 1995 rape of victim 2 as evidence of guilt of the charges relating to the September 10, 1995 incident involving victim 1. Request number 8 stated as follows: "I charge you that the defendant in this case has been charged with crimes relating to two separate and distinct incidents. In deciding whether the State has met its burden of proof with respect to each and every count of the indictment, you must separately consider the evidence relating to each count. Evidence relating to the first incident alleged in the indictment is not in any manner to be considered by you as proof of, or relevant to, Defendant's guilt or innocence of the second incident. Likewise, evidence relating to the second incident alleged in the indictment is not in any manner to be considered by you as proof of, or relevant to, Defendant's guilt or innocence of the first incident." Request number 9 stated as follows: "I charge you that any statement made by the Defendant in this case with respect to a particular incident charged in the indictment is admissible and should be considered by you only with respect to Defendant's guilt or innocence of that particular incident. Such statement should not be considered for purpose of deciding Defendant's guilt or innocence of any other inci-

dent charged in the indictment, nor should it be considered in any way as evidence of Defendant's character in general. Thus, if you find that a statement was made to the police, freely and voluntarily by Defendant in this case, then you may consider the statement as evidence only with respect to the particular subject matter of the statement, and the particular crime about which Defendant was being questioned at the time."

Wingfield's requested charges were not supported by any citations of authority, and Wingfield conceded, "I don't have any citation for it. This is — I think this is a situation that is the general principle that jurors have to consider the evidence for each count."

The trial court charged a portion of Wingfield's request number 8 as follows: "I charge you that this Defendant in this case has been charged with crimes relating to two separate and distinct incidents. In deciding whether the State has met its burden of proof with respect to each and every count of the indictment, you must separately consider the evidence relating to each count and to each of the two alleged incidents." The trial court also instructed the jury fully regarding the findings necessary before Wingfield's statement could be considered for any purpose.

We are unable to consider the correctness of the requests since Wingfield provided no cited authority for the requested charges, despite being given the opportunity to present such authority. See *Woityra v. State*, 213 Ga. App. 89 (1) (443 SE2d 867) (1994); *Doughty v. State*, 175 Ga. App. 317, 322 (7) (333 SE2d 402) (1985). Wingfield has cited no authority, and we can find no authority, for the proposition that an otherwise free and voluntary statement is limited to a specific crime or event. Moreover, "[t]he failure to give requested instructions in the exact language requested, where the charge given substantially covers the same principle, is not a ground for reversal. [Cit.]" *Doughty,* supra at 323 (7).

3. The trial court did not err in permitting the state to recall victim 1 to the witness stand in order to make an in-court identification of Wingfield where victim 1 testified that her identification had an independent origin other than her view of Wingfield in court and was based on her encounter with Wingfield during the sexual assaults.

After direct and cross-examination, the state was allowed to recall victim 1 and ask her to make an in-court identification of Wingfield after victim 1 volunteered the information that she recognized Wingfield. Wingfield objected that any attempt to elicit an in-court identification should have been made during victim 1's initial examination. The trial court has the discretion to allow a witness to be recalled to present additional evidence even after both sides have closed and even if the witness being recalled has remained in the courtroom and heard other evidence. See *Mitchell v. State*, 223 Ga.

App. 319, 321-322 (7) (477 SE2d 612) (1996); *Darby v. State*, 192 Ga. App. 668, 669 (2) (385 SE2d 758) (1989). It is clear from the record that victim 1 had been on the witness stand immediately before she was recalled, and the circumstances under which she testified were unchanged. In addition, she testified unequivocally that her identification was based on her recollection of her assailant at the time of the assault.

Although Wingfield argues that any in-court identification would be tainted by victim 1's earlier, impermissibly suggestive identification, Wingfield did not raise this argument at trial. "It is well settled that a reason urged by enumeration of error on appeal which is different from that urged below will not be considered for the first time on appeal. [Cits.]" *Brantley v. State*, 177 Ga. App. 13, 14 (1) (338 SE2d 694) (1985). Moreover, "even where a pretrial identification has been found to be tainted, a subsequent in-court identification is admissible if it does not depend on the prior, tainted identification but has some other, independent basis. [Cit.]" *Tiller v. State*, 222 Ga. App. 840, 841 (476 SE2d 591) (1996). Victim 1 specifically testified that her in-court identification was based on her memory of the night she was assaulted: "Describing the person that was there that night has been something that I've thought about a lot over the past year and some months. In the course of the investigation of this, that was one of the — one of the biggest things I remember being questioned about, what did he look like. And after trying to rack my brain for over a year, trying to find out, you know, in my head; and when I looked over there at that table, I realized that is the face that I've been trying to describe for an entire year." Wingfield's arguments regarding victim 1's opportunity to view her assailant go to the weight of the evidence and not its admissibility. Accordingly, this enumeration lacks merit. See *Sanford v. State*, 225 Ga. App. 898 (2) (485 SE2d 233) (1997).

4. In his fourth enumeration of error, Wingfield attempts to combine three separate and distinct enumerations regarding the admission of his confession with respect to the October 19, 1995 rape of victim 2. Pursuant to OCGA § 5-6-40, we may elect to consider all, some or none of the alleged errors in such a case (see *Robinson v. State*, 200 Ga. App. 515, 518 (2) (b) (408 SE2d 820) (1991)). We will consider all three of the alleged errors here since they are easily distinguished and separated in Wingfield's brief.

(a) The trial court did not err in admitting into evidence Wingfield's confession to the October 19, 1995 rape, aggravated sodomy and burglary of victim 2. The trial court held a hearing pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), to determine the voluntariness of Wingfield's confession and determined that Wingfield's confession was freely and voluntarily given.

At this hearing, the state showed that officers advised Wingfield of his *Miranda* rights and Wingfield voluntarily waived those rights. At no time during the videotaped statement did Wingfield indicate that he wished to end the interview.

Wingfield does not allege he was threatened or promised anything in connection with his statement. Nor does he allege he did not speak freely and voluntarily. Rather, he argues that a 20-30 minute interruption in the interview, taken at Wingfield's request so he could use the rest room, renders the balance of the interrogation suspect.

On appellate review, the decision of the trial judge regarding the admission of a custodial statement will be upheld unless the decision is clearly erroneous. *Ryan v. State*, 226 Ga. App. 180, 181 (3) (486 SE2d 397) (1997). Under the circumstances, where there is absolutely no evidence of coercion or improper communication and no indication at any time that Wingfield desired to end the interview, the trial court's decision was not clearly erroneous.

(b) Wingfield next contends the trial court effectively prevented him from testifying at the *Jackson v. Denno* hearing by incorrectly ruling that his testimony at the *Jackson v. Denno* hearing could be used in the state's case-in-chief. However, we recently held in *Brown v. State*, 226 Ga. App. 140, 141-142 (486 SE2d 370) (1997), that a defendant's testimony at a *Jackson v. Denno* hearing *can* be used during the trial of the case. Accordingly, this portion of the enumeration lacks merit.

(c) The trial court did not err in denying Wingfield's request to redact the following portion of his confession: "WINGFIELD: I mean, I know I was wrong for doing what I did, but it's not me. It's just not me there. There's something going through my body. And I went to ask for help for it. DETECTIVE: Uh-huh [affirmative]. WINGFIELD: And I told the lady exactly what happened and what was going on. It's just a certain time of the night that I trigger and I don't know why. DETECTIVE: Okay. It's just something you're saying was in you that just snapped? WINGFIELD: It's something like in my body like that, you know. DETECTIVE: Okay. WINGFIELD: I don't know — I can remember when my grandma, before she died, she told me that I had some of my father's blood, and he was the exact same way."

At trial, Wingfield explained these statements: "Q: [W]hy would your grandmother say that? A: My grandmother just said you have your father's blood, which we all do. We all inherited our father's blood; is that true? Q: What does that have to do with your discussing a sexual assault? A: It really doesn't. That's just something I brought up."

Wingfield argues that the portion of his statement regarding his grandmother's statement to him impermissibly put his character in

issue because in the early 1970s Wingfield's father was convicted of a series of notorious rapes in Clarke County. We find no merit in this argument. There is no evidence that the jury was aware of Wingfield's father's record or that such testimony unduly prejudiced Wingfield's case. We see no error in the trial court's decision not to redact that portion of the confession.

5. In his fifth enumeration of error, Wingfield contends the trial court erred in quashing his subpoena directed to the GBI Crime Lab. At the hearing, Wingfield's attorney stated she requested "a copy of any report or audits done of the GBI Crime Lab in Decatur, Georgia, either internal or external, and I would be willing to discuss that, with respect to the lab's DNA and finger print identification processes including all related processes, protocols and data performed from 1993 until the present, including but not limited to the Twigdam report on DNA work performed by the GBI lab and completed in 1996." The state moved to quash this subpoena on the grounds that the request was unreasonable and oppressive and sought production of material not subject to subpoena.

"The defense must make a prima facie showing that the requested materials are relevant to his defense and that he has a right to the materials[,] [cit.], and the trial court may properly quash an unreasonable and oppressive subpoena. [Cits.]" *Bazemore v. State*, 225 Ga. App. 741, 745 (5) (484 SE2d 673) (1997). According to the record, the subpoena at issue was served approximately two weeks prior to trial and requested a broad range of reports or audits performed from 1993 through 1996. Accordingly, the trial court did not abuse its discretion in quashing the subpoena.

Furthermore, Wingfield has failed to show that there is a reasonable probability that, had the specific Twigdam audit report been disclosed to him, the outcome of his trial would have been different. See *Ledford v. State*, 264 Ga. 60, 66 (13) (439 SE2d 917) (1994). Wingfield's attorney had the opportunity and, in fact, did cross-examine Pickens, the GBI Crime Lab's employee who conducted the DNA testing in the present case, regarding her qualifications and her testing procedures, as more fully discussed in Division 6 of this opinion. This enumeration lacks merit.

6. Wingfield's sixth enumeration asserts that the trial court erred in admitting DNA evidence because Pickens' qualifications were insufficient to authorize expert status and because Pickens failed to prove the general reliability and scientific acceptance of DNA identification. We disagree.

Pickens was qualified as an expert witness in the field of DNA analysis after testifying that 1) she has been employed at the Georgia State Crime Laboratory for sixteen years; 2) she has a bachelor of science degree in biology from Savannah State College, where she also

majored in chemistry; 3) she had extensive training from the director of the crime lab serology unit and from the director of the DNA unit; 4) she has taken numerous workshops and seminars in the fields of forensic serology and DNA analysis, as well as specialized classes in these two fields at the Federal Bureau of Investigation; 5) she is a member of the American Academy of Forensic Scientists and the Southern Association of Forensic Scientists; 6) she is certified as a forensic scientist by the American Board of Criminalistics and is required to take continuing education courses and training to maintain her certification; 7) she has testified as an expert in court over two hundred times in the past sixteen years, although some of her testimony has been in fields other than DNA analysis; 8) she has performed DNA analysis for over three years in connection with seventy-five to eighty cases; 9) all cases she has worked are reviewed by members of her section concerning data and final reports before an official report is issued; 10) persons outside the Georgia Bureau of Investigation have reviewed her work; 11) she has taught junior scientists at the crime laboratory; 12) she performed hundreds of DNA analysis tests during her training; 13) she is given semi-annual proficiency tests in DNA analysis; and 14) she has read numerous scientific articles concerning DNA analysis, including current scientific literature.

Concerning the validity of DNA analysis, Pickens testified that 1) she follows procedures that are generally accepted in the scientific community; 2) through her training and examination of literature, she believes the protocol she uses in testing DNA produces reliable and reproducible results; and 3) based on her training and experience, the general scientific principles of the techniques involving DNA testing are valid and capable of producing reliable and reproducible results and are generally accepted in the scientific community. Based on this testimony, the trial court found that the general scientific principles and techniques involved in DNA testing are valid and capable of producing reliable results and that Pickens had performed the scientific procedures in an acceptable manner.

This Court has repeatedly held that " '[i]t is a matter within the sound discretion of the trial judge as to whether a witness has such learning and experience in a particular profession as to entitle him to be deemed prima facie an expert.' [Cit.] . . . To qualify as an expert, generally all that is required is that a person be knowledgeable in a particular matter; his special knowledge may be derived from experience as well as study, and formal education in the subject is not a requisite for expert status. [Cit.]" *Kimbrough v. State*, 215 Ga. App. 303 (1) (450 SE2d 457) (1994). We find there was sufficient evidence to support the trial court's qualification of Pickens as an expert to testify as to the DNA testing and results. Moreover, contrary to

Wingfield's arguments, we find that the state complied with *Johnson v. State*, 265 Ga. 668 (461 SE2d 209) (1995), in showing the reliability of both the DNA testing and the results in this case. There was no abuse of discretion in the present case.

7. In his final enumeration of error, Wingfield asserts the trial court erred in permitting a police officer to testify as to two other local rapes. At trial, Detective Smith was cross-examined by Wingfield regarding the fact that other rapes by black males occurred in Athens-Clarke County during 1995 and 1996 and the fact that rapes occurred in the county while Wingfield was incarcerated. During redirect, the state questioned Detective Smith about the other rapes being investigated and elicited testimony that Wingfield and one other individual were suspects in two additional rapes, but were exonerated through DNA evidence. According to Wingfield, the officer's testimony that Wingfield was dropped as a suspect in those rapes as a result of DNA testing impermissibly allowed the state to comment on Wingfield's guilt in the present case and to bolster the reliability of the state's DNA evidence in the present case. We disagree.

Contrary to Wingfield's argument, Detective Smith did not testify as to the ultimate issue in the case. He merely testified as to the way in which the police department handled the other rape cases. It is clear from the record that Wingfield opened the door to testimony regarding the other rapes by questioning Detective Smith regarding the other rapes and implying that the police department was anxious to make an arrest in these rape cases and that another person committed the rape cases presently before us. Clearly, testimony regarding the other rapes and how the department handled the other rapes, including using DNA evidence to rule out certain suspects, was relevant to show that the police department was not charging Wingfield with every rape occurring in the county. In addition, Detective Smith's testimony regarding the DNA results was not offered to prove the accuracy of the results, but to show the course of action taken by the police department when it received the results. Last of all, Wingfield was not prejudiced by Detective Smith's testimony that Wingfield was exonerated in another rape case on the basis of DNA evidence. Detective Smith did not testify as to why Wingfield was a suspect in the first place and did not impermissibly place Wingfield's character in issue.

Accordingly, the trial court did not err in overruling Wingfield's objections on the grounds of relevance, hearsay and prejudice.

*Judgment affirmed. Pope, P. J., and Blackburn, J., concur.*

DECIDED OCTOBER 30, 1997.

*Rosemary M. Hathaway*, for appellant.

*Harry N. Gordon, District Attorney, James D. Love, Assistant District Attorney*, for appellee.